994 So.2d 50 (2008)
STATE of Louisiana
v.
Gerard E. DAVE.
No. 08-KA-150.
Court of Appeal of Louisiana, Fifth Circuit.
August 19, 2008.
*51 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Thomas J. Butler, Laura Schneidau, Assistant District Attorneys, Twenty-Fourth Judicial District, Parish of Jefferson, Gretna, Louisiana, for Plaintiff/Appellee.
Bruce G. Whittaker, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
Panel composed of Judges FREDERICKA HOMBERG WICKER, GREG G. GUIDRY, and ROBERT L. LOBRANO.
ROBERT L. LOBRANO, Judge Pro Tempore.
Defendant, Gerard E. Dave, appeals his conviction for possession of hydrocodone in violation of LSA-R.S. 40:967 C. On appeal, he argues that the trial court erred in denying his Motion to Suppress Evidence. After thorough consideration of the law and evidence, we find no error, and affirm defendant's conviction.

PROCEDURAL HISTORY
The Jefferson Parish District Attorney filed a Bill of Information charging defendant, Gerard E. Dave, with possession of MDMA[1] in violation of LSA-R.S. 40:966 C (Count 1), and possession of hydrocodone in violation of LSA-R.S. 40:967 C (Count 2). Defendant was arraigned and pled not guilty. The trial court later denied defendant's Motion to Suppress Evidence and Statement.
On December 11, 12, and 13, 2006, the case was tried before a 12-person jury, which found defendant not guilty on Count 1 and guilty as charged on Count 2. The trial court sentenced defendant on January 8, 2007 to imprisonment at hard labor for three years and four months. On that same date, the State filed a multiple bill alleging defendant to be a third felony offender, and defendant admitted those allegations. The trial court vacated the original sentence and resentenced defendant to imprisonment at hard labor for three years and four months without benefit of probation or suspension of sentence. This timely appeal follows.[2]

*52 FACTS

Officer Brandon LeBouef of the Gretna Police Department testified at trial that, on February 25, 2006, at approximately 7:00 p.m., he was working a paid security detail at 62 Westbank Expressway, which was the parking lot for Big Lots, Home Depot, and the Finish Line. While he was patrolling the parking lot, he noticed a truck parked in a "handicap spot" directly in front of the door to Big Lots. Officer LeBouef pulled his police vehicle behind the truck and, while sitting in his vehicle, wrote a parking citation.
As Officer LeBouef approached the truck to place the citation on the windshield, he noticed that it was occupied by two passengers: Defendant, who was sitting in the front seat closest to the passenger side door, and a female, later identified as Charla Bell, who was sitting in the middle of the front seat. Officer LeBouef placed the ticket underneath the windshield wiper on the driver's side. As he started to go back to his vehicle, defendant asked Officer LeBouef what he was doing. Officer LeBouef went to the passenger side door and informed defendant that they were parked in a "handicap spot," and that he had given them a ticket for that violation.
While Officer LeBouef was talking to defendant, another individual, later identified as Steven Adams, approached the truck, got into the driver's side compartment, and pulled out his keys, preparing to drive away. Officer LeBouef walked over to the driver's side door to obtain Adams's information to place onto the ticket. According to Officer LeBouef, Adams became verbally argumentative and abusive, and he initially failed to produce an ID upon request. As soon as Officer LeBouef realized that Adams was being aggressive, he called for additional units to come and assist him.
Defendant initially tried to calm Adams down, but Adams continued getting more aggressive. Adams then "popped" his door open, striking Officer LeBouef in the groin area, and a physical altercation ensued. During the altercation, Officer LeBouef could see defendant turning around like he was going to get out of the truck. The officer yelled at defendant and Bell several times to stay in the truck. Defendant yelled at Officer LeBouef, "`Get off him'" or "`Let him go'" or "something like that," and Bell was screaming incoherently.
Bell got out of the truck and started running toward Officer LeBouef. The officer yelled at her to get back into the truck. Defendant also got out of the truck at some point. Officer LeBouef explained that some individuals standing both inside and outside of Big Lots were watching the interaction. Detective Brian Rico arrived at the scene while Officer LeBouef was still struggling with Adams and while defendant was exiting or attempting to exit the truck. Officer LeBouef told Detective Rico to restrain defendant and Bell, which he did.
Detective Brian Rico of the Gretna Police Department testified at trial that, when he arrived at the scene, he observed Officer LeBouef struggling with Adams inside the doorway of a truck. It appeared to Detective Rico that Officer LeBouef was placing Adams in handcuffs, and that Adams was resisting arrest. Detective Rico exited his vehicle and approached. As soon as he and Officer LeBouef began to detain Adams, defendant and Bell, who were inside the truck, started yelling at them.
*53 Detective Rico grabbed Adams's left arm and pinned it on the door during the struggle. At that moment, defendant exited the passenger side of the truck while yelling profanities and making racial remarks and threats. Once it was obvious that Officer LeBouef had Adams on the ground and was handcuffing him, Detective Rico turned his attention toward defendant.
Detective Rico ordered defendant to get on the ground, but defendant refused. He then went "hands-on" and was able to subdue defendant, place him in handcuffs, and pat him down. Bell also exited the truck while ranting and yelling racial remarks and profanities. Once she was detained, all three subjects were brought toward Officer LeBouef's vehicle.
Officer LeBouef testified that he arrested Adams, defendant, and Bell and advised them of their rights. They were all handcuffed and quickly patted down to ensure that they did not have any obvious weapons. Afterwards, Officer LeBouef searched Adams and found a small amount of marijuana on his person.
Before he searched defendant, Officer LeBouef asked him if he had anything that was going to hurt the officer or that he was not supposed to have. Defendant said he did not have anything. Officer LeBouef then searched defendant and retrieved three Vicodin (also known as hydrocodone) from the front right outer pocket of the large overcoat that defendant was wearing. Officer LeBouef asked defendant what the pills were. Initially defendant said it was something other than Vicodin; however, he eventually admitted to the officer that it was Vicodin.
Officer LeBouef continued to search defendant and found a Ziploc sandwich bag containing 26 pills "packaged in a way typical of drug trafficking" in defendant's left front blue jeans pocket. Initially, defendant did not want to tell Officer LeBouef what it was. Defendant also said he did not know where the pills came from. Officer LeBouef conferred with Detective Rico, telling him that he thought the pills looked like Ecstasy, and Detective Rico agreed. Officer LeBouef approached defendant after the situation calmed down and said, "This is Ecstasy, right?" and defendant answered affirmatively.
Officer LeBouef arrested Adams and charged him with battery on a police officer, resisting arrest, disturbing the peace, and possession of marijuana. He arrested defendant and Bell and charged them with disturbing the peace and for "interfering when they attempted to get out [of the truck]." Officer LeBouef later decided that Bell did not play much of a role in the incident and noted that she did not have an extensive record, so he released her with a summons.
Charles Krone, an expert forensic scientist, testified at trial that the three white tablets retrieved in this case tested positive for hydrocodone. He further testified that the purple tablets retrieved in this case contained MDMA or "Ecstasy," the street name for MDMA.
After the State rested its case, the defense called Charla Bell, who was defendant's daughter and Adams's girlfriend, as a witness. Bell testified that, on February 25, 2006, she, Adams, and defendant stopped at Big Lots to buy some socks. Adams parked the truck and ran into the store while she and defendant waited in the truck. Bell testified that a couple of minutes later, an officer approached and asked them if they knew that they were parked in a "handicap" spot. They apologized and told the officer they did not know, and that they were going to move (the truck). The officer informed them *54 that he was going to have to write a ticket for the violation.
Bell testified that defendant told the officer that the truck belonged to him, so the officer gave him the ticket. Approximately five minutes later, Adams came outside the store. The officer then came back to the truck and asked Adams for his ID and driver's license. Adams and the officer had words, and Bell began to cry. Defendant told Adams to calm down and let the officer do his job. Adams opened the door of the truck in a belligerent manner, and Adams and the officer started to tussle.
Bell testified that the officer eventually took Adams over to the (police) car, and Adams started yelling something. At that time, she saw two more police cars pull up. When defendant saw how emotional Bell was, he said he was going to exit the truck to see what was happening. Defendant got out of the truck, but the officers told him to stay where he was.
Bell testified that defendant "threw" his hands up and stood where he was. Two more officers came, grabbed defendant, and searched him, but did not find anything initially. Afterwards, an unmarked car pulled up, and that was when an officer checked defendant again and said he had pills on him. Bell heard the officer ask defendant, "[W]hat's this in your top pocket?" She also heard defendant say in response that those were his pills from when he injured his arm. Bell explained to the jury that defendant had injured himself at work approximately three weeks or a month before the incident.
Bell testified that the officer subsequently told defendant that he would have to go to jail since he did not have a prescription for those pills. She then heard defendant tell the officer, "`okay.'" Bell did not hear defendant raise his voice or shout profanities at the officers, and she testified that defendant did not make any type of threatening moves toward the officer. Bell also testified that she did not see anyone with a bag containing purple pills.
Defendant testified that he had a prior conviction for murder in 1968 when he was 15 years old, and another conviction for armed robbery in 1981. He further testified that, on the night in question, Adams and the officer began to argue while Adams was still in the truck. Defendant told Adams to relax and to do what the officer told him to do. He then observed Adams get into a physical altercation with the officer.
Afterwards, defendant observed the officer "muscl[e]" Adams all the way to the police car. He explained that that was when Adams began hollering. Defendant testified that he got out of the truck at that time to find out what was happening. As soon as he did so, the officer drew his gun on him, so he threw his hands in the air. The officer told defendant to get down on the ground, and he complied with the officer's request. The officers then handcuffed defendant. Defendant testified that he had three Vicodin tablets in his jacket pocket when he was arrested, and that he told the officer that was his pain medication. He explained to the jury that a clinic doctor had given him five of them about a month before his arrest for his injured arm, but that he had only taken two of them.
Defendant testified that he did not approach the officer in a threatening manner nor did he shout at the officers or say anything to aggravate or agitate them. He explained that he had been through the "system," so he would not have done those things. He said there was "no way" he was going to fight with the police, that he had no reason to fight with them, and that he was no match for them. Defendant *55 testified that he did not know anything about the officer reaching into his pocket and pulling out a bag of 26 purple tablets, and that the only thing in his pocket were the three Vicodins. He further testified that he never saw that bag of pills, and that he did not tell the officer that those pills were Ecstasy.
Marna David, defendant's employer, testified that, prior to the incident, defendant injured his forearm while doing construction work.

ASSIGNMENT OF ERROR NUMBER ONE
Defendant argues that the trial court erred by denying his Motion to Suppress. He contends that Officer LeBouef's actions were not reasonable under the circumstances because his intent from the outset was to trigger a confrontation with defendant and his associates. He asserts, in effect, that the stop of the vehicle based on the violation of the handicapped parking law was a pretext for the illegal stop. He submits that, under the circumstances of this case, the search was illegal and, therefore, the evidence should have been suppressed.
The State responds that defendant is precluded from raising this issue on appeal because he did not raise it in the trial court. Alternatively, the State argues that it was legal for the officer to write a citation and approach the vehicle to place it on the windshield. The State further argues that the officer was justified in subsequently arresting defendant for disturbing the peace and interfering with a police officer, and in confiscating the narcotics he subsequently found on defendant's person under the "search incident to lawful arrest" exception to the warrant requirement.
At the suppression hearing, Officer LeBouef and Detective Rico testified regarding the circumstances surrounding defendant's arrest and the search of his person incident to arrest. Their testimony at the suppression hearing was similar to their trial testimony. After hearing the testimony at the suppression hearing, defense counsel argued that the officers did not have the right to lawfully arrest defendant and, therefore, the search incidental to arrest was impermissible. The trial judge denied the motion, finding that the search incident to arrest was constitutional and properly conducted. Defense counsel noted his objection.
Despite the State's argument that defendant's Assignment of Error was not properly raised at the trial level, we nonetheless address the issue of the correctness of the trial judge's rejection of defendant's Motion to Suppress. We find no error in that ruling.
In a hearing on a Motion to Suppress, the State bears the burden of proof in establishing the admissibility of evidence seized without a warrant. LSA-C.Cr.P. art. 703(D). The trial court's decision to deny a Motion to Suppress is afforded great weight and will not be set aside unless a preponderance of the evidence clearly favors suppression. State v. Leonard, 06-361, p. 4 (La.App. 5 Cir. 10/31/06), 945 So.2d 764, 765. Although not required to do so, an appellate court may review the testimony adduced at trial, in addition to the testimony adduced at the suppression hearing, in determining the correctness of the trial court's pretrial ruling on a Motion to Suppress. State v. Leger, 05-0011, p. 10 (La.7/10/06), 936 So.2d 108, 122, cert. denied, ___ U.S. ___, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007). After review of all the testimony and despite the defendant's insistence to the contrary, we find no reason to disturb the trial court's credibility determinations.
*56 Defendant was also issued a citation for parking in a "no parking" zone. Id. In the instant case, Officer LeBouef had probable cause to believe a traffic violation had occurred when he observed the vehicle in which defendant was a passenger illegally parked in a spot reserved for handicapped customers. Defendant concedes in his brief that the vehicle was illegally parked in a handicapped spot. Undoubtedly, it was lawful for the officer to write the citation and place it under the windshield wiper.[3] See, State v. Hardeman, 04-0760 (La.App. 1 Cir.2/18/05), 906 So.2d 616, which involved a citation issued for a "no parking zone."
The real issue is whether, after issuing the citation, Officer LeBouef had probable cause to arrest defendant and conduct the subsequent search. Probable cause to arrest exists when the facts and circumstances, either personally known to the arresting officer or of which he has reasonable and trustworthy information, are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime. State v. Fisher, 97-1133, p. 7 (La.9/9/98), 720 So.2d 1179, 1184. The standard for assessing probable cause is an objective one that must withstand the "`detached, neutral scrutiny of a judge.'" Id. The determination of probable cause must take into account the "`practical considerations of everyday life on which ... average police officers can be expected to act.'" Id.
In the instant case, defendant was arrested for disturbing the peace, among other things. LSA-R.S. 14:103 defines disturbing the peace in pertinent part as:
A. Disturbing the peace is the doing of any of the following in such manner as would foreseeably disturb or alarm the public:
....
(2) Addressing any offensive, derisive, or annoying words to any other person who is lawfully in any street, or other public place; or call him by any offensive or derisive name, or make any noise or exclamation in his presence and hearing with the intent to deride, offend, or annoy him, or to prevent him from pursuing his lawful business, occupation, or duty; or
....
(4) Engaging in any act in a violent and tumultuous manner by any three or more persons[.]
LSA-R.S. 14:103 A(2) requires the specific intent to deride, offend or annoy another person. State v. Chauvin, 06-362, p. 12 (La.App. 5 Cir. 10/31/06), 945 So.2d 752, 761. The words "`foreseeably disturb or alarm the public'" have previously been interpreted by the Louisiana Supreme Court to "`encompass only conduct which is violent or boisterous in itself, or which is provocative in the sense that it induces a foreseeable physical disturbance.'" Id. Officer LeBouef testified at trial that during his altercation with Adams, he yelled at defendant and Bell several times to stay in the truck when he saw defendant preparing to exit. Nevertheless, both defendant and Bell disobeyed the officer's commands and exited the truck. Officer LeBouef testified at the suppression hearing *57 that defendant was arrested for disturbing the peace because he became loud and was using profanity, which caused people to come to the window of Big Lots and observe the incident and to step outside the store and circle around the area. He also testified that defendant, along with Bell, began interacting with the crowd, inciting them, by saying, "`Look what they're doing to us. They're beating us. They're racist,'" which increased the level of danger to the officers, defendant, Bell, and Adams.
Detective Rico testified at trial that, as he was assisting Officer LeBouef with Adams, he observed defendant exit the truck and round the rear of it while yelling, "`Get your f____king hands off of him. You can't do that. It's wrong. You're racist,'" and "`You're just doing this because he's black,'" and things of that nature. Detective Rico explained that defendant continued toward him in a very aggressive manner. He asserted at trial that defendant was "very volatile" and made threatening statements, and that his words and actions created a "huge officer safety issue."
After reviewing the record, we find that defendant's words and actions constituted probable cause for disturbing the peace under LSA-R.S. 14:103 A(2). Defendant created a disturbance in a public place which justified the officers' actions in arresting him. Once placed under arrest, the search incident to that arrest was lawful and the evidence seized was properly admitted into evidence. This Assignment of Error has no merit.

ERROR PATENT DISCUSSION
Defendant requests an error patent review. However, this Court routinely reviews the record for errors patent in accordance with LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir. 1990) regardless of whether defendant makes such a request. The review reveals no errors patent in this case.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] MDMA is the common name for 3, 4-methylenedioxymethamphetamine, a non-narcotic controlled dangerous substance classified in Schedule I. State v. Adams, 07-355, p. 6 (La. App. 5 Cir. 11/27/07), 973 So.2d 777, 780. See also testimony of Charles Krone.
[2] It is noted that defendant filed a pro se petition for a writ of habeas corpus on January 30, 2007. On April 24, 2007, he filed a motion for clarification of sentence, which the trial court denied as premature. On July 13, 2007, defendant filed a pro se notice of intent alleging that the trial court had failed to answer his motion for clarification of sentence. The trial court denied that motion as moot on July 27, 2007. Defendant filed an application for writ of mandamus with this Court on September 6, 2007 alleging that the trial court failed to answer his motion for clarification of sentence. On October 16, 2007, this Court denied defendant's writ. State ex rel. Gerard Dave v. State of Louisiana, 07-KH-688 (La.App. 5 Cir. 10/16/07) (unpublished writ disposition).
[3] See LSA-R.S. 40:1742 B(1) which provides that no person shall park any vehicle in a mobility-impaired parking space unless such person has a license plate or hang tag for the mobility-impaired. That statute appears to apply to street parking and governmental or public facilities. LSA-R.S. 40:1742 A(1). However, law enforcement officers are mandated to provide for and enforce a penalty for violations of handicapped parking on private property, which has parking for the general public doing business at the location. Op. Att.Gen., No. 99-83, April 6, 1999.